## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| | : | |
| CENTER FOR BIOLOGICAL DIVERSITY, | : | Court No.: 14-00157 |
| TURTLE ISLAND RESTORATION | : | |
| NETWORK, and NATURAL RESOURCES | : | Before: |
| DEFENSE COUNCIL, | : | |
| | : | **COMPLAINT** |
| Plaintiffs; | : | |
| v. | : | |
| | : | |
| PENNY PRITZKER, Secretary of Commerce; | : | |
| NATIONAL MARINE FISHERIES | : | |
| SERVICE; JACOB LEW, Secretary of the | : | |
| Treasury; JEH JOHNSON, Secretary of | : | |
| Homeland Security; and the UNITED | : | |
| STATES OF AMERICA, | : | |
| | : | |
| Defendants. | : | |

## INTRODUCTION

1.      More than forty years ago, Congress passed the Marine Mammal Protection Act ("MMPA" or "the Act") to, among other things, keep dolphins, whales, and other marine mammals from dying or being seriously injured after getting hooked, entangled, or trapped in fishing gear. 16 U.S.C. §§ 1361-1421h. The MMPA seeks to achieve this goal through regulation of both domestic fishing practices and the import of foreign fishery products. In this way, the MMPA's statutory scheme serves to protect marine mammals not just in U.S. waters but marine mammals also around the world that may otherwise be harmed by fisheries supplying the U.S. seafood market. Unfortunately, while many of the domestic provisions of the MMPA have been effectively implemented, in the four decades since its passage, the Act's import provisions, with the exception of imports from certain tuna fisheries that capture dolphins, have largely been ignored. Through this suit, Plaintiffs seek to compel Defendants to comply with the

unambiguous mandates of the MMPA, ensuring that fish imported into the United States meets U.S. standards for marine mammal protection.

2.      Each year around the world, more than 650,000 dolphins, whales, seals, and other marine mammals die or are seriously injured in fishing gear. Ensnared in nets, wrapped in fishing lines, or snagged on fishing hooks, these creatures are "bycatch" of commercial fisheries targeting swordfish, tuna, other finfish, shrimp, lobster, and crab and typically drown or are tossed overboard to die.

3.      The United States imports roughly 90 percent of the seafood Americans consume – more than 5 billion pounds each year, nearly half of which is wild-caught. These finfish, crabs, and shrimp are harvested from all around the world and imported into the lucrative U.S. market from dozens of nations.

4.      Bycatch poses one of the most significant, global risks to marine mammal conservation and threatens the very existence of some of the world's most charismatic species, including the endangered North Atlantic right whale that migrates from Canada south to Florida each year, the Gulf of California's critically imperiled vaquita, dusky and other dolphins off South America, spinner dolphins in the Indian Ocean, and false killer whales off of Hawaii.

5.      Swordfish fisheries across the world have proved problematic. These fisheries employ either huge mesh gillnets or longline gear that can stretch up to 60 miles with thousands of baited hooks, catching swordfish and non-target species, including dolphins, whales, seabirds, and turtles.

6.      The United States has long recognized marine mammal bycatch as a serious threat, and under the MMPA's regulatory regime, the United States has required its U.S. fishermen to reduce bycatch by many means, including gear modifications and closures of risk-

2

prone habitats. Yet the rest of the world lags behind. Some countries have no marine mammal protections, and few match U.S. standards, resulting in the needless death of hundreds of thousands of animals and putting U.S. fishermen at a competitive disadvantage.

7.    Congress sought to remedy this problem by enacting Section 101(a)(2) of the MMPA. The provision requires that "[t]he Secretary of the Treasury shall ban the importation of commercial fish . . . which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). To implement this provision, the Secretary of Commerce "shall insist on reasonable proof" from importing nations of their fisheries' effects on marine mammals. *Id.* Section 101 of the MMPA thus requires the United States to wield its considerable economic influence to conserve, rather than obliterate, marine mammal populations around the world.

8.    However, for decades, the federal government has ignored this key conservation provision and continues to allow the import of millions of tons of foreign seafood, including swordfish, even though it has not sought or received the required "reasonable proof" that foreign fisheries have imposed bycatch requirements at least as robust as those in the United States.

9.    In 2008, Plaintiffs Center for Biological Diversity and Turtle Island Restoration Network filed a rulemaking petition requesting that the Secretaries of Commerce, Treasury, and Homeland Security (collectively, "the Agencies") immediately implement the MMPA's import ban for swordfish. The Agencies have failed to respond to that petition, failed to promulgate regulations to implement Section 101(a)(2), and failed to ban fish imports that kill or seriously injure marine mammals in excess of U.S. standards, in violation of the MMPA and the Administrative Procedure Act ("APA"). 16 U.S.C. § 1371(a)(2); 5 U.S.C. §§ 555; 706. This suit

seeks to rectify those violations and, ultimately, protect dolphins, whales, and seals from

dangerous fishing nets around the world.

## JURISDICTION

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1581(i). The ban on

importation of fish products required by Section 101(a)(2) of the MMPA, 16 U.S.C. §

1371(a)(2), is an embargo, and the Court of International Trade has jurisdiction over any such

ban, as well as actions relating to the ban's administration and enforcement. The APA provides

the cause of action in this case, 5 U.S.C. §§ 701-706, and an actual, justiciable controversy exists

between Plaintiffs and Defendants.

## PARTIES

11.     Plaintiff **Center for Biological Diversity** ("the Center") is a 501(c)(3) nonprofit

corporation incorporated in the State of California and maintains offices across the country,

including in California, Arizona, Alaska, Washington, D.C., Florida, New York, Oregon, and

Washington State. The Center works through science and environmental law to advocate for the

protection of endangered, threatened, and rare species and their habitats both in the United States

and abroad. The Center has more than 50,000 active members and 675,000 online activists.

12.     The Center and its members have a strong interest in protecting marine mammals

and ensuring fish caught or sold in the United States are harvested in a manner that does not

harm marine mammals. Through its Oceans Program, the Center has been working for years to

protect marine mammals threatened by unsustainable fishing practices. The Center has a long

history of advocating for more stringent marine mammal protections, including in gillnet and

longline swordfish fisheries and trap-pot fisheries in the United States and abroad. The Center is

a member of five MMPA-mandated take reduction teams that work to find consensus in fisheries regulation.

13.     The Center's members reside throughout the United States, as well as in other countries. Many Center members regularly view, study, photograph, and enjoy marine mammal species that are susceptible to entanglement in foreign fishing gear. For example, numerous Center members live along the U.S. East Coast and regularly watch right whales, humpback whales, harbor porpoises, dolphins, and other marine mammals that migrate between Canada and the United States. Some of these marine mammals become entangled and die in Canadian lobster gear, gillnet gear, and longline gear. Similarly, Center members live in Florida and along the Gulf of Mexico and regularly view various species of dolphins and whales that become entangled in Mexican fisheries. Members also live in Hawaii and regularly view false killer whales, humpback whales, dolphins, and other marine mammal species that are killed in foreign swordfish fisheries on the high seas. Center members live on the U.S. West Coast and in Alaska and regularly view harbor porpoises, humpback whales, gray whales, and other marine mammals that migrate across the United States' borders with Mexico and Canada. These mammal populations are sometimes entangled in Mexican and Canadian gillnet, trap-pot, longline, and other fisheries. Other Center members live internationally or regularly visit areas around the world specifically to view and enjoy marine mammal species and populations that suffer high levels of entanglement in foreign fishing gear. Center members also catch and sell fish caught subject to U.S. standards, and/or purchase and consume or seek to purchase and consume fish caught with minimal impacts to marine mammals.

14.     Plaintiff **Turtle Island Restoration Network** ("Turtle Island") is a nonprofit corporation headquartered in Marin County, California and with offices in Texas and Costa Rica.

Turtle Island engages citizens around the globe to study, restore, and take action to protect disappearing marine ecosystems and the endangered wildlife that inhabit them. Turtle Island has 7,200 active members, including members in the United States and abroad, and more than 138,000 online activists and supporters who follow and take action on its campaigns. Turtle Island and its members share a commitment to the study, protection, enhancement, conservation, and preservation of the world's marine ecosystems and the wildlife that inhabits the oceans. Turtle Island has worked extensively to conserve and protect marine mammals in U.S. and foreign waters, including through advocating for stricter regulations domestically and around the world.

15. Many of Turtle Island's staff and members regularly view, photograph, study, and enjoy populations of marine mammals that are susceptible to entanglement in foreign fisheries. For example, Turtle Island members on both U.S. mainland coasts and in Hawaii regularly view porpoises, whales, and seals that are susceptible to entanglement and death in foreign gillnets, longlines, and trap-pot gear. Similarly, a Turtle Island member travels to Costa Rica twice a year to tag and census turtles and sharks, and while there, he enjoys viewing spotted, spinner, and bottlenose dolphins, humpback whales, and other marine mammals that are susceptible to fishing gear entanglement. The same member also has plans to visit Mexico and to return to the Galapagos this year to view sea turtles and marine mammals. Another Turtle Island member lives in San Jose, Costa Rica and regularly visits the coast to view marine mammals. Other members of Turtle Island work as naturalists on whale watching tour boats and are professional marine wildlife photographers.

16. Plaintiff **Natural Resources Defense Council, Inc.** ("NRDC") is a national environmental advocacy group organized as a New York not-for-profit membership corporation.

6

NRDC has offices in New York, Washington, D.C., Chicago, Bozeman, San Francisco, Santa Monica, and Beijing, China. NRDC has more than 330,000 members and more than one million online activists. NRDC's mission is to "safeguard the Earth; its people, its plants and animals, and the natural systems on which all life depends." Defending endangered wildlife and wild places is one of NRDC's six strategic priorities. For two decades, NRDC has worked to protect marine mammals and other marine resources and to fulfill the promise of the Marine Mammal Protection Act. Many NRDC members in North America and around the world regularly view, study, photograph, and enjoy marine mammal species that are susceptible to entanglement in foreign fishing gear.

17.     The interests of Plaintiffs and their members are harmed by Defendants' violations of law as described in this complaint.  Plaintiffs and their members suffer substantive, procedural, and informational injuries from Defendants' violations of law. Because Defendants have failed to issue regulations or otherwise implement MMPA Section 101(a)(2) for non-tuna fish, fish and fish products imported into the United States continue to be caught in a manner that kills and seriously injures marine mammal species that Plaintiffs' members enjoy viewing. Defendants' failure to comply with the MMPA makes it less likely that Plaintiffs' members will be able to observe, study, and enjoy these animals. Moreover, Plaintiffs' members who either catch and sell fish and fish products caught subject to U.S. standards, or who purchase and consume or seek to purchase and consume fish caught with minimal impact to marine mammals, are harmed by the presence of such imported seafood in the U.S. market. However, if Defendants were to grant the rulemaking petition and implement Section 101(a)(2) for all non-tuna fish, exporting countries would implement stricter marine mammal protections if they want to ensure they can continue having access to the lucrative U.S. market. Fewer marine mammals would be

killed, and Plaintiffs' members would have a greater chance of studying, viewing, photographing, and enjoying marine mammals in the wild and would be assured that any fish sold in the U.S. was caught in a manner at least as protective of marine mammals as from domestic fisheries.

18.     Plaintiffs and their members also suffer procedural and informational injuries from Defendants' violations of law. Few countries currently publicly provide data regarding their fisheries, fishing technology, and importantly, marine mammal bycatch. Without this data, it is difficult for Plaintiffs to advocate for stricter fisheries regulations internationally, and Plaintiffs must spend substantial time and resources identifying and tracking bycatch. If Defendants complied with the MMPA's mandate and required nations to provide "reasonable proof of the effects" of their commercial fisheries on marine mammals, this data would be available to Plaintiffs and their members, saving the organizations substantial time, effort, and finances in their research and advocacy, and enabling them to advocate more effectively for stricter bycatch measures in those countries. Such information would also allow Plaintiffs and their members the assurance that any fish they seek to purchase and consume was caught in a manner at least as protective of marine mammals as from domestic fisheries.

19.     Defendant **Penny Pritzker** is the Secretary of Commerce. In this capacity Secretary Pritzker directs all business of the Department of Commerce. Pursuant to the MMPA, the Department of Commerce is responsible for protecting and managing the fish, marine mammals, and other marine resources of the United States, including implementing MMPA Section 101(a)(2). In her official capacity Secretary Pritzker is responsible for violations alleged in this Complaint.

20.    Defendant **National Marine Fisheries Service** ("NMFS") is a federal agency within the National Oceanic and Atmospheric Administration in the Department of Commerce and has been delegated authority by the Secretary of Commerce to implement the MMPA, including Section 101(a)(2). NMFS is responsible for violations alleged in this Complaint.

21.    Defendant **Jacob Lew** is the Secretary of the Treasury. In this capacity, he directs all business of the Department of the Treasury. Under the MMPA, the Department of the Treasury is responsible for banning the importation of commercial fish or fish products that do not meet Section 101(a)(2)'s standards. In his official capacity Secretary Lew is responsible for violations alleged in this Complaint.

22.    Defendant **Jeh Charles Johnson** is the Secretary of Homeland Security. In this capacity, he directs all business of the Department of Homeland Security. Pursuant to the Homeland Security Act of 2002 and Treasury Order 100-16, certain customs functions were transferred from the Secretary of the Treasury to U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security, including implementation of import bans. 6 U.S.C. §§ 101 *et seq.*; 68 Fed. Reg. 28,322 (May 23, 2003). In his official capacity Secretary Johnson is responsible for violations alleged in this Complaint.

23.    Defendant **United States of America** has ultimate authority over all actions of agencies within the executive branch, including the Department of Commerce, Department of Treasury, and Department of Homeland Security. The United States is responsible for violations alleged in this Complaint.

## STATUTORY FRAMEWORK

### A. The Marine Mammal Protection Act

24.     In passing the MMPA in 1972, Congress found that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). To address these threats, the MMPA contains a wide array of provisions designed to protect and recover marine mammals both domestically and abroad.

25.     As one major impetus for enacting the MMPA was to address the hundreds of thousands of dolphins that were drowning in fishing nets each year, much of the statute focuses on reducing fisheries bycatch, with the "immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." *Id.* § 1371(a)(2).

26.     To achieve this goal, the MMPA requires some of the world's most stringent standards for marine mammal protection.

27.     Specifically, Section 118 of the MMPA requires that U.S. commercial fisheries "shall reduce incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate," referred to as the "zero mortality rate goal," or "ZMRG." *Id.* § 1387(b)(1).

28.     To implement this requirement, the MMPA requires NMFS to regularly track the status of all marine mammal populations and bycatch from all U.S. fisheries. Specifically, NMFS must prepare a "stock assessment" for each marine mammal population in U.S. waters, documenting the population's abundance and trend, describing the fisheries that interact with the

stock, and estimating the level of "mortality and serious injury" caused by those fisheries each

year. *Id.* § 1386(a). Based on the stock assessment, the agency must then estimate the "potential

biological removal" for each stock, *id.*, defined as the "maximum number of animals . . . that

may be removed . . . while allowing that stock to reach or maintain its optimum sustainable

population," *id.* § 1362(20).

29.     NMFS must then develop a "take reduction plan" for all marine mammal stocks

in which human-caused mortality exceeds the potential biological removal level, and for any

stock listed under the Endangered Species Act. *Id.* §§ 1387(f)(1); 1362(19). Each take reduction

plan must contain regulatory measures to reduce fishery-related mortality and serious injury to

"less than the potential biological removal level" within six months of the plan's implementation.

*Id.* § 1387(f)(4), (5). The "long-term goal" of the plan must be to reduce bycatch levels to the

"zero mortality and serious injury rate." *Id.* § 1387(f)(2). By regulation, NMFS has defined

achieving ZMRG as reducing take to ten percent or less of the estimated potential biological

removal. 69 Fed. Reg. 43,338 (July 20, 2004).

30.     Finally, the MMPA requires NMFS to monitor and "obtain statistically reliable

estimates" of bycatch, including placing observers onboard fishing vessels. 16 U.S.C. § 1387(d).

31.     In addition to its provisions related to domestic fisheries, the MMPA regulates the

import of fish products into the United States. Specifically, Section 101(a)(2) of the MMPA

provides:

> **The Secretary of the Treasury shall ban the importation** of commercial fish or
> products from fish which have been caught with commercial fishing technology
> which results in the incidental kill or incidental serious injury of ocean mammals
> in excess of United States standards. **For purposes of applying the preceding
> sentence, the Secretary [of Commerce] –**
>
> (A) **shall insist on reasonable proof** from the government of any nation from
> which fish or fish products will be exported to the United States of the effects on

ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States.

*Id.* § 1371(a)(2) (emphasis added).

32.     Pursuant to the Homeland Security Act of 2002 and Treasury Order 100-16, certain customs functions were transferred from the Secretary of the Treasury to U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security, including implementation of import bans. 6 U.S.C. §§ 101 *et seq.*; 68 Fed. Reg. 28,322 (May 23, 2003).

33.     Section 102 of the MMPA further provides that it is "unlawful to import . . . [a]ny fish . . . caught in a manner which the Secretary has proscribed for persons subject to the jurisdiction of the United States, whether or not any marine mammals were in fact taken incident to the catching of the fish." 16 U.S.C. § 1372(c)(3).

 **B.  The Administrative Procedure Act**

34.     The APA requires that "each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). The APA further requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id*. § 555(b).

35.     The APA provides a cause of action to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* § 702. The APA requires the reviewing court to: "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." *Id.* § 706.

## FACTUAL AND PROCEDURAL BACKGROUND

36.    As a result of the MMPA, the United States has some of the most stringent marine mammal bycatch standards in the world. Scientists estimate U.S. bycatch may have declined by up to 40 percent due to conservation measures implemented in the 1990s.

37.    However, around the world, other nations' fisheries still kill hundreds of thousands of whales, dolphins, seals, and sea lions each year with little or no regulation. These marine mammals are caught in a variety of fisheries, including driftnets and gillnets targeting finfish and sharks, longlines targeting swordfish and tuna, trap-pot fisheries targeting lobster and crab, and shrimp trawls.

38.    Globally, bycatch poses one of the most significant risks to marine mammal conservation. Bycatch threatens the very existence of many populations, including the endangered North Atlantic right whale, the critically imperiled vaquita, dusky and other dolphins off South America, spinner dolphins in the Indian Ocean and Southeast Asia, sperm whales in the Mediterranean, and false killer whales off of Hawaii. Cetaceans are particularly at risk due to their generally low reproductive rates.

39.    Data on entanglement risks in many countries, particularly in Asia, Africa, Oceania, and even Mexico, remain scarce. For example, the Northwest Pacific Ocean off Asia has some of the world's most productive waters, fished by major seafood exporters like Thailand, Vietnam, and China, the nation that reports largest landings. Yet bycatch in this area is virtually unmonitored and likely grossly underestimated. Similarly, bycatch from gillnets in the Indian Ocean is largely undocumented, but is believed to be a major conservation issue.

40.    Marine mammal entanglement is increasing worldwide, as the world's human population grows and fisheries become more industrialized.

41.     Each year, the United States imports tens of thousands of tons of both edible and non-edible fish and fish products, worth over $30 billion annually. In 2012, the United States imported almost 5.4 billion pounds of edible seafood, valued at over $16 billion, putting the U.S. just behind Japan as the world's second-largest importer. Canada and Mexico were among the top countries exporting fish products to the United States, with edible imports from those countries valued at $2.5 billion and $475 million, respectively. The United States sources this seafood from more than 125 nations around the world. In 2012, the United States imported 6,000 tons of swordfish for consumption, valued over $50 million.

42.     The Secretary of Commerce through NMFS has promulgated regulations implementing MMPA Section 101(a)(2)(B)'s ban on importation of yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean. However, the Secretary of Commerce does not currently have regulations implementing MMPA Section 101(a)(2) for non-purse-seine-caught tuna fish, or for other fish or fish products. The Secretary of Commerce does not currently have regulations implementing MMPA Section 101(a)(2)(A)'s requirement for reasonable proof.

43.     Neither the Secretary of Treasury nor the Secretary of Homeland Security through Customs and Border Protection currently have regulations implementing MMPA Section 101(a)(2). Nor has the Secretary of Treasury or the Secretary of Homeland Security otherwise implemented MMPA Section 101(a)(2) for non-purse-seine-caught tuna fish, or for other fish or fish products.

44.     On March 4, 2008, the Center for Biological Diversity and Turtle Island Restoration Network submitted a rulemaking petition to the Secretaries of Commerce, Homeland Security, and Treasury ("the Agencies"). The petition requested that the Agencies "carry out their non-discretionary duties" under MMPA Section 101(a)(2) to "obtain[ ] reasonable proof

from countries exporting swordfish" and "ban imports of swordfish from any and all countries" that have failed to provide that proof. The petition requested a ban on the import of all swordfish and swordfish products unless and until the Agencies "demand" and "receive" "reasonable proof from any nation" and the Agencies "determine that [the nation] demonstrates that the swordfish and swordfish products to be imported were not caught with commercial fishing technology that results in the incidental kill or incidental serious injury of marine mammals in excess of U.S. standards."

45.     The petition described the gear used in swordfish fisheries and applicable U.S. fishery regulations, including various drift gillnet bans and requirements for pingers, observers, closures, and restrictions on longline gear. The petition also described several major swordfish exporting nations' lack of fishery regulations.

46.     On October 6, 2008, the Department of Homeland Security, through CBP, responded to the petition. The agency stated that the petition was "not properly directed to U.S. Customs and Border Protection" because, pursuant to Treasury Department Order No. 100-16, the "Secretary of the Treasury retains the sole authority to approve any regulations concerning import quotas or trade bans." However, Homeland Security/CBP acknowledged its "role in this matter" could either be: (1) "enforcing . . . Department of Commerce regulations promulgated by . . . NMFS by the issuance of an enforcement order approved by the Treasury Department, or (2) the possible drafting of CBP regulations . . . which would simply cross reference the Commerce regulations."

47.     In contrast, in a 2013 response to a Congressional letter encouraging the Secretaries of Commerce and Treasury to promptly implement Section 101(a)(2), the

15

Department of Treasury stated its responsibilities under MMPA Section 101(a)(2) "have been delegated to the Department of Homeland Security."

48.    On December 15, 2008, the Department of Commerce, through NMFS, formally announced its receipt of the petition for rulemaking. 73 Fed. Reg. 75,988 (Dec. 15, 2008). On January 29, 2009, Plaintiffs and other concerned organizations sent a letter to NMFS expressing their support for the petition and the immediate implementation of the law to "achieve the nation's vital interests in protecting marine mammals from harmful fishing practices as well [as] protecting U.S. fishers from unfair competition with unregulated international fishing fleets." On February 2, 2010, the Center for Biological Diversity and Turtle Island Restoration Network sent a notice letter to NMFS, noting that the petition had been pending for nearly two years and requesting that the agency "take action immediately to comply with its responsibilities under Section 101" of the MMPA.

49.    On April 30, 2010, NMFS issued an Advance Notice of Proposed Rulemaking. 75 Fed. Reg. 22,731 (Apr. 30, 2010). The agency announced it was "developing procedures to implement" the MMPA's fish import provisions. The "rulemaking would define the 'United States standards' referred to in MMPA Section 101(a)(2), along with any associated criteria by which the US would assess foreign fisheries" under the provision. Further, Commerce would adopt "procedures for developing recommendations regarding import prohibitions" if the standards were not met. *Id.* Plaintiffs submitted comments in response.

50.    In 2012, NMFS published its International Marine Mammal Action Plan and stated that its very first international priority is to "[r]educe the bycatch of marine mammals in international and foreign fisheries to sustainable levels."

51.    In numerous meetings between December 2011 and February 2014, Plaintiffs met with NMFS's Office of International Affairs staff to request that the agency move forward on its rulemaking. Each time, the agency assured Plaintiffs that a proposed rule was forthcoming.

52.    However, no rules have been proposed or finalized implementing MMPA Section 101(a)(2) for swordfish or any other fish except yellowfin tuna. Fish, including swordfish and swordfish products, continue to be imported into the United States, even though exporting countries fail to provide proof that the fish were caught in a manner that does not exceed United States marine mammal protection standards.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Failure to Respond to Rulemaking Petition

53.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

54.    Congress enacted Section 101(a)(2) of the MMPA more than 40 years ago.

55.    The Center for Biological Diversity and Turtle Island Restoration Network submitted an MMPA Section 101(a)(2) swordfish rulemaking petition in March 2008, pursuant to the APA.

56.    However, the Departments of Commerce, Treasury, and Homeland Security have failed to respond to the petition. The Agencies have failed to issue regulations and implement MMPA Section 101(a)(2) for swordfish, and the United States continues to import swordfish and other non-tuna fish and fish products from countries that have failed to provide proof that the fish were caught with commercial fishing technology that does not result in the incidental kill or incidental serious injury of ocean mammals in excess of U.S. standards.

57.     The Departments of Commerce, Treasury, and Homeland Security have

unreasonably delayed their response to the petition in violation of the APA. 5 U.S.C. §§ 555(b);

706.

58.     Alternatively, to the degree Homeland Security's 2008 letter can be deemed a

denial of the petition, Homeland Security has authority to ban the import of swordfish and other

fish from nations that do not comply with MMPA Section 101(a)(2). Accordingly, Homeland

Security's denial of the petition was arbitrary, capricious, and contrary to law in violation of the

APA and the MMPA. 5 U.S.C. § 706; 16 U.S.C. § 1372(a)(2).

**SECOND CLAIM FOR RELIEF**

**Failure to Comply with MMPA Section 101(a)(2)**

59.     Plaintiffs reallege and incorporate by reference the allegations contained in all

preceding paragraphs of this Complaint.

60.     MMPA section 101(a)(2)(A) requires that "[t]he Secretary of the Treasury shall

ban the importation of commercial fish . . . which have been caught with commercial fishing

technology" resulting in take "in excess of United States standards." 16 U.S.C. § 1371(a)(2).

This is a mandatory, nondiscretionary duty.

61.     Pursuant to the Homeland Security Act of 2002 and Treasury Order 100-16,

certain customs functions were transferred from the Secretary of the Treasury to U.S. Customs

and Border Protection, an agency within the Department of Homeland Security, including

implementation of import bans. 6 U.S.C. §§ 101 *et seq.*; 68 Fed. Reg. 28,322 (May 23, 2003).

62.     The Departments of Treasury and Homeland Security have failed to ban the

importation of commercial fish or fish products that have been caught with commercial fishing

technology that results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards, as required by the MMPA. 16 U.S.C. § 1371(a)(2).

63.     MMPA Section 101(a)(2)(A) requires that "[f]or purposes of applying the preceding sentence, the Secretary [of Commerce] – shall insist on reasonable proof from the government of any nation from which fish . . . will be exported to the United States of the effects on ocean mammals." 16 U.S.C. § 1371(a)(2). This is a mandatory, nondiscretionary duty.

64.     The Department of Commerce has failed to insist on reasonable proof from exporting nations of their fisheries' effects on ocean mammals.

65.     The Departments of Commerce, Treasury, and Homeland Security have unlawfully withheld action and failed to act in violation of MMPA Section 101(a)(2) and the APA. 16 U.S.C. § 1371(a)(2); 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

Therefore, Plaintiffs respectfully request that the Court:

1.     Declare that the Department of Commerce, the Department of Treasury, and the Department of Homeland Security have unreasonably delayed their response to the petition in violation of the APA, and in the alternative, declare that the Department of Homeland Security arbitrarily and capriciously denied the petition in violation of the APA;

2.     Declare that the Department of Commerce, the Department of Treasury, and the Department of Homeland Security have failed to act in implementing MMPA Section 101(a)(2) in violation of the APA;

3.     Enter appropriate injunctive relief to ensure full compliance with MMPA Section 101(a)(2), including requiring Defendants to propose and finalize rules implementing MMPA Section 101(a)(2) by a date certain;

4.    Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5.    Grant such other relief as the Court deems just and proper.


Respectfully submitted this 2nd day of July, 2014,


*s/ Sarah Uhlemann*
Sarah Uhlemann*
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
Phone: (206) 327-2344
Email: suhlemann@biologicaldiversity.org
* Attorney of Record for filing

Rebecca Noblin
Center for Biological Diversity
P.O. Box 100599
Anchorage, AK 95510-0599
Phone: (907) 274-1110
Email: rnoblin@biologicaldiversity.org

Brendan R. Cummings*
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232x304
Email: bcummings@biologicaldiversity.org
*CIT Admission Pending

*Attorneys for Plaintiffs Center and Turtle Island*

Stephen Zak Smith*
Natural Resources Defense Council
1314 2nd Street
Santa Monica, CA  90401
Phone: (310) 434-2334
Email: zsmith@nrdc.org
*CIT Admission Pending

*Attorney for Plaintiff NRDC*